IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| KENNETH DAVIS | § | |
| | § | |
| v | § | C.A. NO. C-08-127 |
| | § | |
| MICHAEL ASTRUE | § | |

**MEMORANDUM AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Kenneth Davis brought this action seeking review of the

Commissioner's final decision that he is not entitled to Title II Disability Insurance

Benefits ("DIB"), or Title XVI Supplemental Security Income Benefits ("SSI").

(D.E. 1).  On August 8, 2008, defendant filed a motion for summary judgment.

(D.E. 9).  On August 13, 2008, plaintiff filed a brief in support of his original

complaint, which was construed as a cross-motion for summary judgment.  (D.E.

10).  On September 10, 2008, defendant filed a response to plaintiff's motion.

(D.E. 11).[1]  For the reasons stated herein, it is respectfully recommended that

plaintiff's cross-motion for summary judgment be granted and that the case be

remanded.

---

[1] On September 19, 2008, plaintiff filed a reply brief to defendant's summary judgment
motion that was stricken as untimely.  (D.E. 13).

# I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

# II.  BACKGROUND

## A.    Procedural History.

On October 17, 2005, plaintiff filed an application for disability insurance benefits, alleging an onset date of June 1, 2005.  Tr. 57.  He asserted that he suffered from rheumatoid arthritis, carpal tunnel syndrome, high blood pressure, and joint and bone pain.  Tr. 59.

On January 20, 2006, plaintiff's application was denied.  Tr. 41.  On February 23, 2006, he requested reconsideration.  Tr. 40.  On April 14, 2006, his claim was again denied.  Tr. 35.  Plaintiff requested a hearing before an administrative law judge ("ALJ").  Tr. 30.  On November 19, 2007, the ALJ issued his decision holding that the plaintiff was not disabled, and therefore, not entitled to either DIB or SSI benefits.  Tr. 13.  Plaintiff filed a request for review with the Appeals Council.  Tr. 12.  On February 28, 2008, his request was denied.  Tr. 4.

On April 18, 2008, plaintiff filed this action.  (D.E. 1).  On July 11, 2008, defendant answered the complaint.  (D.E. 6).

**B.** **Plaintiff's Medical Records.**

Plaintiff is fifty-three years old, has a GED and had worked as a senior operations and maintenance technician on an oil pipeline for twenty-four years at the time of his claim. Tr. 57-64. Plaintiff's alleged disabilities included arthritis, carpal tunnel syndrome, high blood pressure, and back and shoulder pain. Tr. 59.

**1.** **Plaintiff's arthritis and joint pain.**

First, plaintiff alleges arthritis as an impairment, which he described as "rheumatoid arthritis." Tr. 59. Nothing in the record supports a claim of rheumatoid arthritis, but plaintiff has a history of osteoarthritis, particularly in his knees. Tr. 82. On December 12, 2005, Dr. Rene Rodriguez examined plaintiff and diagnosed him as suffering from "degenerative arthritis affecting all major joints." Tr. 174. This degenerative joint disease ultimately led to a total left knee replacement on January 7, 2004. Tr. 85, 174, 227. The total knee replacement followed other surgeries, including arthroscopy and meniscectomy. Tr. 238. By March 16, 2004, plaintiff's physical therapist noted that he had "returned to light duty status." Tr. 242. As of an April 1, 2004 Functional Capacity Evaluation, plaintiff's physician, Dr. Clark, determined that plaintiff had the ability to do heavy work. Tr. 316. Dr. Clark further concluded, "I think [plaintiff] has done well beyond expectations and I have no objection of [sic] him returning to full work activities without restriction." Tr. 316. He did note, however, that plaintiff "may

3

be somewhat limited in his ability to do full squat." Id.  Plaintiff continued to

work in his position at the oil company for more than a year after his knee

replacement until April 2005.  Tr. 60.

Plaintiff also suffered from osteoarthritis that affected his hip joints.  Tr.

174.  On September 19, 2005, he had a CT scan of his pelvis, that, according to the

clinical notes of Dr. Gutierrez, indicate that he suffered from "arthritis involving

the right hip."  Tr. 164.  On November 23, 2005, plaintiff had a bone scan that

revealed "osteoarthritis of the right hip."  Tr.  255.  On January 5, 2006, Dr. Clark

recommended that plaintiff "avoid repetitive pounding activities and use a cane in

his left hand."  Tr. 217.  On April 19, 2006, Dr. Clark further recommended that

plaintiff "limit driving in car/truck as much as possible to prevent increasing

symptoms in [right] hip."  Tr. 401.

On August 17, 2006, plaintiff saw Dr. Clark about pain in his left hip.  Tr.

215.  Dr. Clark noted that "[w]e have previously documented early degenerative

joint disease of the right hip."  Tr. 215.  He further noted that "[h]e has had two

intra-articular steroid injections in the right hip, the last of which gave him

significant improvement, though he still has some aching pain."  Id.  In the same

record, Dr. Clark remarked on plaintiff's complaints about pain in his left hip.  He

determined that "examination of the left hip reveals full range of motion, pain on

extremes of flexion.....  Good strength on flexion and extension, abduction and

adduction." Id.  He concluded, "I think as far as the hip is concerned, we definitely

need to be concerned about him having similar pathology on the left hip as on the

right.  A previous MRI suggests early degenerative disease."  Tr. 216.

Plaintiff complained of other problems in his hips as well.  On September

15, 2005, he saw Dr. Clark about pain in his right hip.  Tr. 146.  An x-ray taken

during that visit revealed an "exostosis[2] arising from the lateral aspect of the iliac

crest."  Id.  A CT scan of plaintiff's pelvis taken on September 19, 2005 revealed

findings "suggestive of acetabular-femoral impingement syndrome."  Tr. 165.  On

April 19, 2006, plaintiff was under Dr. Clark's care for "avascular necrosis[3] of

[right] hip."  Tr. 401.

**2.      Plaintiff's carpal tunnel syndrome.**

Plaintiff also suffers from carpal tunnel syndrome.  Tr. 174.  On June 28,

2000, he had a neurological consultation performed by Dr. Deborah Carver

regarding "bilateral hand pain."  Tr. 273.  Dr. Carver diagnosed him with carpal

tunnel syndrome.  Tr. 274.  She recommended "ergonomic changes and wrist

splints" but concluded, "since he has had no significant improvement with the use

of wrist splints, I would consider surgical release."  Id.

---

[2] An "exostosis" is "a benign bony growth projecting outward from the surface of a
bone."  Dorland's Illustrated Medical Dictionary 634 (29th ed. 2000) [hereinafter Dorland's].

[3] "Avascular necrosis" is "necrosis in which tissue becomes a dry, opaque, eosinophilic
mass containing the outlines of anucleated cells, resulting from the denaturation of proteins
following hypoxic injury, such that caused by ischemia in infarction."  Dorland's, at 1181.

On July 17, 2000, plaintiff was seen by Dr. Christopher Miskovsky.  Tr. 206.  Dr. Miskovsky noted that he "does not utilize his splints at night."  Id.  He found that plaintiff's symptoms were "consistent with mild carpal tunnel syndrome bilaterally."  Id.  Dr. Miskovsky also concluded that his shoulders, elbows, and wrists all had "full range of motion without pain."  Tr. 207.  On October 23, 2000, Dr. Miskovsky determined that despite using wrist splints at night and taking Tylenol for pain, plaintiff had "considerable symptoms which continue."  Tr. 203.

Dr. Miskovsky recommended carpal tunnel releases.  Id.  On November 8, 2000, plaintiff underwent a right carpal tunnel release.  Tr. 212.  On January 12, 2001, roughly two months post-surgery, Dr. Miskovsky observed that he was "doing fairly well with regards to the right side."  Tr. 200.  He thought that plaintiff would benefit from a left carpal tunnel release.  Id.  On February 7, 2001, plaintiff underwent a left carpal tunnel release.  Tr. 211.  On August 10, 2001, Dr. Miskovsky saw him again, and noted that he had been doing quite well post-surgery, but had increased pain after performing heavy activities at work.  Tr. 195.  At that time, Dr. Miskovsky also recommended removal of a right volar ganglion cyst.[4]  Tr. 196.  On August 15, 2001, plaintiff had the right volar ganglion cyst removed.  Tr. 210.

---

[4] A "ganglion" is "a benign cystic tumor occurring on an aponeurosis or tendon, as in the wrist or dorsum of the foot; it consists of a thin fibrous capsule enclosing a clear mucinous fluid."  Dorland's, at 725.

6

### 3.     Plaintiff's high blood pressure.

Plaintiff also claimed to be suffering from high blood pressure.  On February 1, 2006, he saw Dr. William Curtis, who noted that he had a history of hypertension.  Tr. 288.  At that visit, plaintiff's blood pressure was measured at 130/80.[5]  Id.  Dr. Curtis prescribed Lisinopril[6] for plaintiff to treat his high blood pressure.  Tr. 64.  On March 19, 2007, Dr. Curtis observed that plaintiff's hypertension was stable with Lisinopril.  Tr. 292-93.  He opined that "[s]ince taking prescribed medication for this problem, the severity has been well-controlled.  Side effects reported by the patient are none."  Tr. 292.

### 4.     Plaintiff's back and shoulder pain.

On August 23, 2006, plaintiff sought physical therapy for "increasing problems with pain in the left shoulder."  Tr. 240.  Paige Christensen, the physical therapist who consulted with him, noted that he had received an injection from Dr. Clark on August 17, 2006, after which "the range of motion improved significantly and pain had decreased significantly."  Id.  Plaintiff was diagnosed with

---

[5] "Hypertension" is "high arterial blood pressure; various criteria for its threshold have been suggested, ranging from 140 mm Hg systolic and 90 mm Hg diastolic to as high as 200 mm Hg systolic and 110 mm Hg diastolic."  Dorland's, at 858.

[6] "Lisinopril" is "an oral long-acting angiotensin converting enzyme inhibitor." Physician's Desk Reference 2065 (62nd ed. 2008) [hereinafter PDR].

impingement syndrome in the left shoulder and had scapular winging[7] bilaterally

and a limited range of motion in all directions.  Id.  He was referred to physical

therapy for "education and instruction in a home exercise program for one visit

only."  Id.

Plaintiff also complained of low back pain.  On February 1, 2006, he saw

Dr. David Wilson for his back pain.  Tr. 291.  He found that plaintiff had a history

of sciatica and determined that plaintiff had "mild disc space narrowing and

degenerative spurring at L2-L3 " and "mild arthropathy at L3."  Id.  He also

concluded that "a much lesser degree of degenerative spurring is seen elsewhere in

the lower spine."  Id.  Ultimately, plaintiff was diagnosed with "mild degenerative

disc disease and facet arthropathy limited to L5-S1."  Id.  He was taking Mobic[8] for

pain at the time of his claim.  Tr. 64.

**5.    Plaintiff's depression.**

Plaintiff did not specifically allege that depression limited his ability to

work.  However, he did allege that he suffered from depression as a result of his

physical problems on the Form SSA-3368, which he submitted in his original

claim.  Tr. 59.  However, there is no medical evidence of depression in the record.

---

[7] "Scapular winging" is "when [the scapula] protrudes at rest or with arm and shoulder movement....  It may limit overhead arm use."  Scapular Winging, NYU Medical Center, available at http://www.med.nyu.edu/neurosurgery/pns/conditions/injuries/scapular.html.

[8] "Mobic" is "a member of the enolic acid group of nonsteroidal anti-inflammatory drugs (NSAIDs)."  PDR, at 856.

Plaintiff gives no history of psychiatric treatment, hospitalization, or medication. Tr. 68.

**C.    The October 15, 2007 Administrative Hearing.**

On October 15, 2007, the ALJ held a hearing on plaintiff's disability claim. Tr. 435.  Jackie Jorgensen represented the plaintiff.  Tr. 437.  A vocational expert, Donna Johnson, and a medical expert, Dr. Dorothy Leong, testified at the hearing. Id.

At the administrative hearing, the medical expert stated that, according to his doctor, plaintiff "could do heavy work" as of two months following his total knee replacement.  Tr. 441.  She believed a person who had a total knee replacement would be able to stand six hours during a work day.  Tr. 452.  She concluded that the pain in plaintiff's hip would not affect his ability to stand for six hours in a work day.  Tr. 451.  The medical expert doubted that his possible acetabular-femoral impingement syndrome was significant, because "the patient had on examination a full painless range of motion of the hip, and no symptoms referable to the hip joint itself."  Tr. 448-49.

Plaintiff testified that he did not write because it hurt his hands too much. Tr. 458.  He could not do hand work, and never fully recovered from his carpal tunnel surgery.  Tr. 458-59.  He also sometimes had trouble grasping things.  Tr. 460.  He could not kneel or squat because of pain in his lower back.  Tr. 459.

9

Furthermore, he could not lift his left arm above shoulder height, although he could

lift his right arm.  Id.

Plaintiff testified that he was depressed because he was not working and had

money problems.  Tr. 463.  He explained that he sometimes had trouble

remembering things, but he attributed that to his age.  Id.  At the hearing, he did

not address how his high blood pressure rendered him disabled.

The ALJ posed the following hypothetical to the vocational expert:

> I'd like you to assume an individual alleging
> disability at age 49, and he is currently 52 years of age.
> He has a high school education, as he testified to, and he
> had several years of college and restaurant
> management....  I would like you to assume these
> limitations.  I would limit the overhead reaching with
> respect to the left upper extremity.  The right is not....  He
> is right-handed.  And I would also have fine fingered
> continuous manipulation bilaterally would not be
> permitted.  Occasional or frequent would be okay.  Gross
> manipulation is not limited.  He would, I'm going to also
> limit the driving as a condition of employment.  He
> doesn't drive very long distances as he said....  I'm going
> to start with that 50 and 25 pounds noted by the doctor,
> and occasional stoop, kneel and crouch.  I'm going to
> limit any balancing activities as well as climbing up
> ladders, ropes, or scaffolds, and working at unprotected
> heights around dangerous moving machinery.  He could
> stand and walk six of eight, and sit six of eight with the
> normal break periods for this hypothetical.

Tr. 467.

The vocational expert opined that she did not think plaintiff could perform

his past relevant work.  Tr. 468.  She testified, however, that he could perform light

unskilled work as a rental clerk, sales attendant, floor attendant, or gate attendant.

Id.  She indicated that there were respectively 1800, 5200, 1600, and 1700 such

jobs at the state level.  She determined that a person could perform these jobs even

with the use of a cane.  Tr. 469, 471-72.  Plaintiff would be subject to termination,

however, if he missed more than two days a month, or could not work a full eight

hours because he needed to rest.  Tr. 469-70.

**D.     The ALJ's Decision.**

On November 19, 2007, the ALJ issued an unfavorable decision.  Tr. 13.  He

found that plaintiff had insured status through December 31, 2010, but concluded

that he had not been under a disability from June 1, 2005 (his alleged onset date)

through the date of the ALJ's decision.  Tr. 16.  There was no evidence that

plaintiff had engaged in any substantial gainful activity after his alleged onset date.

Tr. 18.

The ALJ found that plaintiff suffered from the severe impairments of

osteoarthritis and carpal tunnel syndrome.  Id.  However, none of his impairments

met or equaled listed impairment.  Id.; see also 20 C.F.R. § 404, Subpt. P., App. 1.

There was no evidence of nerve root compression, spinal arachnoiditis, or

pseudoclaudication.  Therefore, he concluded that plaintiff's arthritis did not meet

the severity requirements of the regulation.  Tr. 19; see also 20 C.F.R. § 404,
Subpt. P, App. 1.  The ALJ failed to explain why plaintiff's carpal tunnel syndrome
did not meet the listed impairments.

The ALJ determined that plaintiff's residual functional capacity ("RFC")
permitted him to perform "light work except limited driving as a condition of
employment, limited kneeling, stooping and balancing, limited climbing ladders,
ropes and scaffolds, and limited work at unprotected heights and around dangerous
moving machinery."  Tr. 19.  He found that while plaintiff's medically
determinable impairments could reasonably be expected to produce his alleged
symptoms, his testimony was not credible as to their intensity, persistence, and
limiting effects.  Tr. 20.  He determined that "[t]he claimant's credibility is reduced
because he was on unemployment for six months after the onset of the alleged
disability," and "[t]he claimant engaged in substantial gainful activity for more
than a year after his knee replacement."  Id.  However, the ALJ concluded that
plaintiff was unable to perform his past relevant work as a senior operations and
maintenance technician for an oil pipeline.  Tr. 20-21.

The ALJ then made the findings necessary to use the medical-vocational
guidelines, or "grid rules," as a framework for determining whether plaintiff could
perform work present in the national economy in substantial numbers.  Tr. 21; see

also 20 C.F.R. §§ 404.1563, 416.963.  He found that the vocational expert had

testified that given plaintiff's age, education, and work experience, plaintiff could

perform a number of given jobs that existed in significant numbers in the national

economy.  Tr. 21.  Thus, he concluded that "[a] finding of 'not disabled' is

therefore appropriate under the above-cited rule."  Tr. 22.

### III.  LEGAL STANDARDS

**A.     Social Security Act Disability Benefits Requirements.**

The same law and regulations govern whether an individual is considered

disabled and therefore entitled to benefits under either the DIB or the SSI

provisions of the Social Security Act.  Haywood v. Sullivan, 888 F.2d 1463, 1467

(5th Cir. 1989) (per curiam) (citations omitted).  Specifically, the Social Security

Act establishes that every individual who is insured for DIB, has not attained the

set retirement age, has filed an application for disability benefits, and is under a

disability is entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).

Disability is defined as the "inability to engage in substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act

further provides that a claimant is not disabled if that person can perform jobs

available in the national economy:

> An individual shall be determined to be under a disability
> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific
> job vacancy exists for him, or whether he would be hired
> if he applied for work.  For purposes of the preceding
> sentence ... "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

**B.      Social Security Administration Regulations and Rulings.**

To determine if an individual suffers from a disability, as defined by the

Social Security Act, the Commissioner has promulgated regulations containing a

five-step sequential process to be used by the Social Security Administration.  20

C.F.R. §§ 404.1520, 416.920.  A disability finding at any point in the five-step

sequential process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d

1019, 1022 (5th Cir. 1990) (citation omitted).  A claimant bears the burden of

proof on the first four steps, but the burden shifts to the Commissioner at the fifth

step.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citation

omitted).  The claimant must prove that: (1) he is not presently engaged in

substantial gainful activity; (2) he suffers from an impairment or impairments that are severe; and that either (3) the impairment meets or equals an impairment listed in the appendix to the regulations; or (4) due to the claimant's RFC, the impairment prevents the claimant from doing any past relevant work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000) (citation omitted).  The Commissioner may find that a claimant's impairment fails to meet the significant limitation requirement of step two "only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Id. at 391 (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Step three requires a claimant to prove that any of his impairments meets one or more of the impairments listed in the regulations, which includes both physical and mental impairments.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria

for determining the severity of the listed mental impairments look at whether there is marked interference with activities of daily living, social functioning, concentration, persistence or pace, and repeated episodes of decompensation. Id. at Part A § 12.00(C). The regulation defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing daily activities of living, maintaining social relationships, or maintaining concentration, persistence, or pace." Id. at Part A § 12.00(C)(4). The claimant must present evidence that the impairment is a long-term problem rather than a temporary set-back, but "does not have to show a 12 month period of impairment unmarred by any symptom-free interval." Singletary v. Bowen, 798 F.2d 818, 821 (5th Cir. 2000) (citations omitted).

Pursuant to the fourth step, a claimant who is unable to show that his impairment meets one of the listed impairments must show that he is unable to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant's RFC is taken into consideration to determine whether the claimant's impairments may cause physical and mental limitations that affect his or her ability to work. 20 C.F.R. §§ 404.1545, 416.945. The RFC is the most a claimant can do despite any limitations caused by an impairment. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

All relevant evidence in the record, including medical and non-medical evidence, is taken into consideration by the Commissioner when making a determination of a claimant's RFC.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The Commissioner must consider all of plaintiff's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and non-medical evidence in the record.  SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).  "[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  Id. at *2.  When a claimant's statements concerning symptoms and their associated limitations "are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  Id.

The adjudicator's discussion of a claimant's RFC must thoroughly discuss and analyze the objective medical and other evidence in relation to the symptoms.  SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996).  This discussion must include a resolution of any inconsistencies in the record, address a logical explanation of effects of the alleged symptoms on the individual's ability to work, contain a determination of why symptom-related functional limitations can or

17

cannot be reasonably accepted as consistent with medical or non-medical evidence, and address any medical opinions contained in the record.

If the claimant is able to meet his burden under the first four elements, the burden shifts to the Commissioner. The fifth step requires the Commissioner to determine, based on the claimant's RFC, age, education, and work experience, if the claimant can make an adjustment to other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the claimant is disabled. Id.

**C.    Judicial Review Of The ALJ's Decision.**

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. See Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); accord Carey, 230 F.3d at 135 (citation omitted). The Fifth Circuit has described this burden as more than a scintilla, but less than a preponderance. Leggett v. Chater, 67 F.3d 558, 564 (5th

18

Cir. 1995) (citation omitted).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam) (citation omitted).

If the Commissioner's findings are supported by substantial evidence, the Court must defer to the Commissioner, and affirm the findings.  See Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002) (citation omitted).  In applying the substantial evidence standard, courts scrutinize the record to determine whether such evidence is present.  They, however, do not reweigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner.  Id.; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).  Factual conflicts that exist in the record are for the Commissioner and not the Court to resolve.  Masterson, 309 F.3d at 272.  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) opinions and diagnosis of examining or treating physicians; (3) subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

# IV.  ANALYSIS

Plaintiff asserts that the ALJ did not apply the correct legal standard in his case because he failed to provide a detailed analysis of his treatment records and to give appropriate weight to his treating physician's evidence.  (D.E. 10, at 7-9). Specifically, he argues that in support of his decision, the ALJ cites only to non-treating sources, such as the consultative examiner, the state agency medical consultant, and the testifying doctor.  Id.  He further asserts that the ALJ's RFC finding was incorrect because plaintiff could not squat or kneel due to his impairments.  Id. at 9.

## A.    The ALJ Failed To Explain The Weight Given To The Opinion Of Plaintiff's Treating Physician.

An ALJ is required to explain the weight given to the opinion of a claimant's treating physician.  The regulations promulgated by the Social Security Administration provide that:

> If we find a treating source's opinion on the issue(s) of the nature and severity of your impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors listed in (d)(3) through (d)(6) of this section in determining the weight to give to the opinion. We will always give good reasons for the weight we give

your treating source's opinion.

20 C.F.R. § 404.1527(d)(2).  In <u>Newton v. Apfel</u>, 209 F.3d 448 (5th Cir. 2000), the

Fifth Circuit held "that, absent reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, an ALJ may

reject the opinion of the treating physician *only* if the ALJ performs a detailed

analysis of the treating physician's views under the criteria set forth in 20 C.F.R.

§ 404.1527(d)(2)."  <u>Id.</u> at 453 (emphasis in original).  The criteria set forth by

Social Security regulations include whether a treating physician's opinions are

"well-supported by medically acceptable clinical and laboratory diagnostic

techniques ... not inconsistent with ... other substantial evidence," and also the

length of the treatment relationship and frequency of examination, nature and

extent of the treatment relationship, supportability, consistency, specialization, and

other factors brought to the ALJ's attention.  20 C.F.R. § 404.1527(d).  Even when

a physician's opinion does not meet the test for controlling weight, it is still

entitled to deference, and in many cases should still be accorded the greatest

weight.  <u>Newton</u>, 209 F.3d at 456; <u>see also</u> <u>Loza</u>, 219 F.3d at 395 ("The ALJ is not

at liberty to make a medical judgment regarding the ability or disability of a

claimant to engage in gainful activity, where such inference is not warranted by

clinical findings.  Consequently, the ALJ and the Commissioner committed

21

reversible error by failing to accord 'great weight' to the medical reports of the treating physicians.") (citations omitted).

Here, the ALJ failed to discuss the weight given to the opinion of plaintiff's treating physician.  In his decision, he referred only to the opinions of the consultative examiner, the state agency medical consultant, and the testifying doctor.  Tr. 20.  If the ALJ declined to give the opinion of plaintiff's treating physician's controlling weight, then in accordance with the regulations, he was required to explain the weight given to the treating physician's opinion, applying the factors set out in the regulations.  20 C.F.R. § 404.1527(d)(2).  He was required to explain the reasons for his decision as to the weight given to the treating physician in a detailed analysis and give good reasons for the weight given to that opinion.  See id.; see also Newton, 209 F.3d at 453.  Here, the ALJ did neither of those things; in fact, he did not discuss the opinion of the treating physician, or the weight it was given, in his decision at all.  Accordingly, it is respectfully recommended that the ALJ applied the incorrect legal standard in determining the weight to be given to the opinion of the treating physician.

**B.    The ALJ Did Not Properly Consider All Evidence In Evaluating Plaintiff's RFC.**

Social Security Administration rulings require that the ALJ "evaluate the intensity, persistence, and limiting effects" of plaintiff's symptoms.  See SSR 96-

7p, 1996 WL 374186, at *2.  The Fifth Circuit has established that, while not

binding, Social Security Administration rulings are "frequently relied upon ... in

evaluating ALJs' decisions."  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)

(per curiam) (citations omitted).  If a plaintiff's symptoms are not founded in

objective medical evidence, then the ALJ must make a credibility determination of

plaintiff's complaints.  SSR 96-7p, 1996 WL 374186, at *2.  In making this

determination, the ALJ must make every effort to obtain available information and

must, among other things, take into consideration evidence concerning the

duration, frequency, and intensity of symptoms, and the type, dosage,

effectiveness, and side effects of medicine taken for symptoms.  See 20 C.F.R.

§ 404.1529(c)(3).

        In this case, the ALJ found that while plaintiff's medically determinable

ailments could reasonably be expected to produce his alleged symptoms, plaintiff's

statements concerning the intensity, persistence and limiting effects of these

symptoms were not entirely credible.  Tr. 20.  He concluded that plaintiff's

credibility was reduced because he was on unemployment for six months after his

alleged onset date, and because he continued to engage in substantial gainful

activity for more than a year after his knee replacement.  Id.

        The ALJ made a determination as to plaintiff's credibility, but did not

discuss the extent to which plaintiff's description of his symptoms was supported by the objective medical evidence in the record.  Specifically, the ALJ noted that plaintiff continued to engage in substantial gainful activity for more than a year after his knee replacement, but failed to explain how plaintiff's alleged problems with his back and hips might affect his ability to kneel and squat.  Tr. 20.  He also failed to consider the effect any medication the plaintiff was taking for pain would have on plaintiff's ability to perform the jobs identified by the vocational expert. Id.  The ALJ did not discuss whether objective medical evidence in the record supported plaintiff's claim that he could not stoop or kneel; he also did not address the extent to which the medical record supported his claims of pain.  Accordingly, it is respectfully recommended that the ALJ did not apply the correct legal standard when making his RFC determination.

**C.     The ALJ's Error Was Not Harmless.**

The Fifth Circuit has determined that district courts reviewing denials must apply a harmless error analysis.  Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.") (citation omitted).  The Audler court further explained that "'[p]rocedural perfection in administrative proceedings is not required' as long as

'the substantial rights of a party have not been affected.'" <u>Id.</u> (citation omitted).

Plaintiff's substantial rights have been affected because the ALJ's failure to explain the weight given to the opinion of plaintiff's treating physician and his failure to consider all the evidence as to plaintiff's complaints of pain and his alleged inability to squat or kneel casts doubt on the ALJ's conclusion that plaintiff could perform light work.  The ALJ found that because plaintiff could perform a restricted range of light work, Medical-Vocational Rule 202.14 was applicable and would support a finding of "not disabled."  Tr. at 21; <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.14.  The Fifth Circuit has explained that "light work 'presupposes an ability to stand and walk at least 6 hours in an 8-hour work day.'" <u>Lawler v. Heckler</u>, 761 F.2d 195, 198 (5th Cir. 1985) (per curiam).

If, however, plaintiff is unable to perform light work and is restricted to sedentary work, then the question of the transferability of his job skills becomes an issue.  The ALJ made no finding as to the transferability of plaintiff's job skills, because a finding of "not disabled" would be permitted by the Medical-Vocational Guidelines regardless of the transferability of plaintiff's job skills if plaintiff was capable of performing light work.  Tr. 21-22; <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rules 202.14, 202.15.  If plaintiff is restricted to sedentary work, he may be found "not disabled" if his job skills are transferable.  20 C.F.R. Pt. 404, Subpt.

P, App. 2, Rule 201.15.  However, if his job skills are not transferable, a finding of "disabled" is required by the Medical-Vocational Guidelines.  Id. at Rule 201.14.

Plaintiff testified that his pain made it impossible for him to sit or stand for long periods, that he had pain and numbness in his legs, and that he used a cane. Tr. 20.  The Commissioner has explained that the "major difference between sedentary and light work is that most light jobs – particularly those at the unskilled level of complexity – require a person to be standing or walking most of the day." SSR 83-14, 1983 WL 31254, at *4 (S.S.A. Nov. 30, 1982).  The ALJ's hypothetical posited a person who could stand six hours a day and sit six hours a day.  Tr. 467.  The ALJ did not adequately articulate his reasons for discounting plaintiff's subjective complaints of pain, especially given that he found that plaintiff's medically determinable impairments could reasonably be expected to give rise to the symptoms alleged by the plaintiff.  Tr. 20.  Thus, given his failure to adequately determine the severity of plaintiff's non-exertional impairments, the ALJ's finding that plaintiff had the RFC to perform light work is in doubt. Therefore, it is respectfully recommended that the Commissioner has not carried his burden of showing that plaintiff can perform work which exists in the economy in substantial numbers.  Accordingly, it is respectfully recommended that the ALJ's failure to correctly apply the relevant standards was not harmless.

## V.  **RECOMMENDATION**

Based on the foregoing reasons, it is respectfully recommended that defendant's motion for summary judgment, (D.E. 9), be denied, that plaintiff's cross-motion for summary judgment, (D.E. 10), be granted, and that the case be remanded for further proceedings consistent with this memorandum and recommendation.

Respectfully submitted this 24th day of September 2008.

_____

BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 02-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).